1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLOS B. NUNEZ, | No.  2:20-CV-1138-DMC |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, ECF Nos. 3 and 8, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending before the Court are the parties' briefs on the merits, ECF Nos. 15 and 17.

The Court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

1

1  a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

2  including both the evidence that supports and detracts from the Commissioner's conclusion, must

3  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

4  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's

5  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

6  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

11  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

13  Cir. 1988).

14          For the reasons discussed below, the Commissioner's final decision is affirmed.

15

16                    **I.  THE DISABILITY EVALUATION PROCESS**

17          To achieve uniformity of decisions, the Commissioner employs a five-step

18  sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§

19  404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

20              Step 1      Determination whether the claimant is engaged in
                            substantial gainful activity; if so, the claimant is presumed
21                          not disabled and the claim is denied;

22              Step 2      If the claimant is not engaged in substantial gainful activity,
                            determination whether the claimant has a severe
23                          impairment; if not, the claimant is presumed not disabled
                            and the claim is denied;
24
25              Step 3      If the claimant has one or more severe impairments,
                            determination whether any such severe impairment meets
26                          or medically equals an impairment listed in the regulations;
                            if the claimant has such an impairment, the claimant is
                            presumed disabled and the claim is granted;
27  / / /

28  / / /

2

| | | |
|---|---|---|
| 1 | Step 4 | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| 4 | Step 5 | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A).  The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).  The claimant has the initial burden of proving the existence of a disability.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work.  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

3

## II.  THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on September 22, 2017. See CAR 54.[1] In the application, plaintiff claims disability began on February 1, 2017.  See id.  Plaintiff's claim was initially denied.  Following denial of reconsideration, Plaintiff requested an administrative hearing, which was held on April 11, 2018, before Administrative Law Judge (ALJ) Judith A. Kopec. In a February 27, 2019 decision, the ALJ concluded Plaintiff is not disabled based on the following relevant findings:

1.  The claimant has the following severe impairments: left knee patellofemoral syndrome, degenerative disc disease, obesity, major depressive disorder with psychotic features, and anxiety;

2.  The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.  The claimant has the following residual functional capacity: to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he can lift, carry, push, or pull 10 pounds frequently, and 20 pounds occasionally. He can sit for 6 hours, and stand and walk for 6 hours. He must alternate positions as needed but he is able to remain at the workstation and on task. He can occasionally climb ramps and stairs. He cannot climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. He cannot be exposed to unprotected heights and moving mechanical parts. He cannot operate a motor vehicle. He can perform simple routine tasks. He can have occasional direct contact with coworkers. He can work in the presence of others, but cannot be part of a work team that requires regularly working directly with others to accomplish a task. He requires a low stress environment, meaning he is able to make simple routine decisions, and adapt to routine changes in work processes or settings;

4.  Considering the claimant's age, education, work experience, residual functional capacity, vocational expert testimony, and the Medical-Vocational Guidelines, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

See id. at 57-69.

After the Appeals Council declined review on April 14, 2020, this appeal followed.

---

[1]    Citations are to the Certified Administrative Record (CAR) lodged on February 1, 2021, ECF No. 11.

1          **III.  DISCUSSION**

2                  In his opening brief, Plaintiff argues: (1) the ALJ erred in rejecting medical

3      opinion evidence regarding mental limitations without articulating sufficient reasons for doing so;

4      and (2) Plaintiff's statements and testimony concerning his pain, symptoms, and level of

5      limitation were improperly rejected.

6          **A.      Medical Opinions**

7                  "The ALJ must consider all medical opinion evidence." Tommasetti v. Astrue,

8      533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not

9      explicitly rejecting a medical opinion.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir.

10     2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical

11     opinion over another.  See id.

12                 Under the regulations, only "licensed physicians and certain qualified specialists"

13     are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); see also Molina v. Astrue,

14     674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on

15     an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it

16     rests on his own independent examination of the claimant." Tonapetyan v. Halter, 242 F.3d 1144,

17     1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute

18     substantial evidence when the opinions are consistent with independent clinical findings or other

19     evidence in the record.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Social

20     workers are not considered an acceptable medical source.  See Turner v. Comm'r of Soc. Sec.

21     Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants

22     also are not acceptable medical sources.  See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016).

23     Opinions from "other sources" such as nurse practitioners, physician assistants, and social

24     workers may be discounted provided the ALJ provides reasons germane to each source for doing

25     so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874

26     F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance

27     when opinions from "other sources" may be considered acceptable medical opinions).

28     / / /

5

1    The Commissioner has promulgated revised regulations concerning how ALJs

2    must evaluate medical opinions for claims filed, as here, on or after March 27, 2017.  See 20

3    C.F.R. §§ 404.1520c, 416.920c.  These regulations supersede prior caselaw establishing the

4    treating physician rule which established a hierarchy of weight to be given medical opinions

5    depending on their source.  See id.; see also Jones v. Saul, 2021 WL 620475, at *9 (E.D. Cal.

6    Feb. 17, 2021) ("In sum, because (1) the 2017 regulations are not arbitrary and capricious or

7    manifestly contrary to statute, (2) the prior judicial construction was not mandated by the

8    governing statutory language to the exclusion of a differing agency interpretation, and (3) the

9    [treating-physician rule] is inconsistent with the new regulation, the court concludes that the 2017

10   regulations effectively displace or override [prior caselaw.]").  Thus, ALJs are no longer required

11   to "defer to or give any specific evidentiary weight to" treating physicians over medical opinions

12   from other sources.  See Carr v. Comm'r of Soc. Sec., 2021 WL 1721692, at *7 (E.D. Cal. Apr.

13   30, 2021).

14       Under the revised regulations, the ALJ must evaluate opinions and prior

15   administrative medical findings by considering their "persuasiveness."  See Buethe v. Comm'r of

16   Soc. Sec., 2021 WL 1966202, at *3 (E.D. Cal, May 17, 2021) (citing 20 C.F.R. § 404.1520c(a)).

17   In determining how persuasive the opinion of a medical source is, an ALJ must consider the

18   following factors:  supportability, consistency, treatment relationship, specialization, and "other

19   factors."  See Buethe, 2021 WL 1966202, at *3 (citing § 404.1520c(b), (c)(1)-(5)).  Despite a

20   requirement to consider all factors, the ALJ's duty to articulate a rationale for each factor varies.

21   See Buethe, 2021 WL 1966202, at *3 (citing § 404.1520c(a)-(b)).

22       Specifically, in all cases the ALJ must at least "explain how [she] considered the

23   supportability and consistency factors," as they are "the most important factors."  See Buethe,

24   2021 WL 1966202, at *4 (citing § 404.1520c(b)(2)).  For supportability, the regulations state:

25   "[t]he more relevant the objective medical evidence and supporting explanations presented by a

26   medical source are to support his or her medical opinion(s) or prior administrative medical

27   finding(s), the more persuasive [the opinion] will be."  See Buethe, 2021 WL 1966202, at *4

28   (quoting § 404.1520c(c)(1)).  "For consistency, the regulations state: '[t]he more consistent a

6

1   medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

2   medical sources and nonmedical sources in the claim, the more persuasive [the opinion] will be.'"

3   Buethe, 2021 WL 1966202, at *4 (quoting § 404.1520c(c)(2)).  "The ALJ is required to articulate

4   findings on the remaining factors (relationship with claimant, specialization, and 'other') only

5   when 'two or more medical opinions or prior administrative medical findings about the same

6   issue' are 'not exactly the same,' and both are 'equally well-supported [and] consistent with the

7   record.'"  Buethe, 2021 WL 1966202, at *4 (quoting § 404.1520c(b)(2) & (3)).

8           At Step 4, the ALJ considered various medical opinions of record in determining

9   Plaintiff's residual functional capacity.  See CAR 65-67.  In particular, the ALJ considered

10  opinions from the following sources: (1) E. Harrison, M.D.; (2) Satish Sharma, M.D.; (3) Lauri

11  Stenbeck, Psy.D.[2]; and (4) Heather M. Abrahimi, Psy.D..  See id.  The ALJ found Dr. Harrison's

12  opinions not "entirely persuasive."  Id. at 65.  Dr. Sharma's opinions were found "mostly

13  persuasive."  Id.  Dr. Stenbeck's opinions were found "somewhat persuasive."  Id. at 66.  The

14  ALJ found Dr. Abrahimi's opinions "persuasive."  Id.  Plaintiff argues the ALJ failed to articulate

15  sufficient reasons for concluding that Dr. Stenbeck's opinions as to mental capacity are only

16  "somewhat persuasive."  ECF No. 15, pgs. 9-14.

17          Regarding Plaintiff's mental capacity, the ALJ evaluated the opinions of Drs.

18  Stenbeck and Abrahimi.  As to Dr. Stenbeck, whose opinions the ALJ found only "somewhat

19  persuasive," and Dr. Abrahimi, whose opinions were found "persuasive," the ALJ stated:

20              The claimant underwent a mental health consultative examination on
                February 22, 2018, conducted by Lauri Stenbeck, M.D. Dr. Stenbeck
21              stated that the claimant generally had mild limitations. However, she
                reported that the claimant had no significant limitation in performing
22              simple and repetitive tasks. She indicated that the claimant was mildly to
                moderately limited in attention, concentration and memory. She
23              mentioned that the claimant was moderately limited in maintaining regular
                attendance in the workplace; moderately limited in completing a normal
24              workday or workweek without interruptions; and moderately limited in his
                ability to deal with the usual stressors encountered in the competitive work
25              environment. (Exhibit 8F). I find this opinion to be somewhat persuasive.
                Dr. Stenbeck's opinion was supported only by her one-time examination
26              of the claimant. While, her opinion was largely consistent with the record
                as a whole, it did not provide specific functional mental limitations. The
27              mental limitations in the residual functional capacity assessment of this

28  _____
        [2]     The ALJ erroneously refers to Dr. Stenbeck as "M.D."

decision are better specified, as well as consistent with the medical record. The record shows that the claimant has a history of experiencing anxiety and depression, brought on by past traumatic experiences, especially motor vehicle accidents, and frustration over his physical ailments. He received treatment in 2014-2015 for his mental health issues, including behavioral health therapy and medication, and showed improvement. After stopping treatment for a period, he started up again in mid-2017, and showed some improvement again. His mental status examinations, including the mental health consultative examination, showed some deficits in mental functioning, but these findings were nevertheless compatible with low stress, unskilled work. In fact, there is some indication that the claimant continued some level of work during the period at issue. While the claimant endorsed symptoms of self-isolation and agoraphobia, he nevertheless interacted appropriately with his healthcare providers in general, with only a few instances of angry outbursts when his treatment was not going smoothly. Moreover, he maintained at least one-long term marriage, and he interacted with his children. (See e.g. Exhibits 7E, 3F/1-3, 5F, 7F/12/38, 8F, 10F, 12F, 15F, 18F). The above facts support the mental limitations set forth in the residual functional capacity assessment of this decision.

On March 15, 2018, Heather M. Abrahimi, Psy.D., a State agency medical consultant, opined that the claimant was capable of understanding, remembering and sustaining concentration, pace and persistence for simple routines throughout a normal workday/workweek; able to accept routine supervision and interact with co-workers in a non-collaborative and superficial basis; capable of brief and infrequent public contact; and capable of adapting to a routine and predictable work environment, recognizing typical hazards traveling to routine locations and setting goals independently within the framework noted above. (Exhibits 5A, 6A). I find this opinion to be persuasive. Dr. Abrahimi supported this opinion with evidence from the record as it existed at the time. While additional evidence was received afterwards, Dr. Abrahimi's opinion is generally consistent with the record as a whole. Moreover, as opposed to the opinion of Dr. Stenbeck, Dr. Abrahimi set forth some specific mental limitations, which are easier to assess and implement. The medical record supports most of the limitations set forth by Dr. Abrahimi, and thus I have implemented the majority of her opinion within the residual functional capacity assessment of this decision. However, I did not find a limitation of brief and infrequent public contact was warranted, as the claimant has shown significant improvement in his anxiety when complaint with his treatment, and he interacted appropriately with his healthcare providers in general. Moreover, he has managed to maintain at least one-long term marriage, indicating that he can handle some public interactions. (See e.g. Exhibits 7E, 3F/1-3, 5F, 7F/12/38, 8F, 10F, 12F, 15F, 18F). Within the framework of the other limitations contained in the residual functional capacity assessment of this decision, a significant public interaction limitation is not necessary.

CAR 66-67.

/ / /

/ / /

1    Plaintiff argues: (1) the ALJ's decision fails to address Dr. Stenbeck's opinion that

2    Plaintiff would have difficulty consistently maintaining attendance; and (2) the ALJ fails to

3    acknowledge Dr. Stenbeck's opinion that Plaintiff will have difficultly taking order s from

4    supervisors and would need gentle feedback.  See ECF No. 15, pgs. 11-13.  According to

5    Plaintiff:

6           The ALJ found Dr. Stenbeck's opinion "somewhat persuasive" and
            supported. However, Dr. Stenbeck's opinion regarding attendance and the
7           likely need for "gentle feedback" from a supervisor was omitted from the
            residual functional capacity assessment without any reason for the
8           omissions. The omission without explanation constitutes error. See Social
            Security Ruling 96-8P, 1996 WL 374184, at *7 ("If the RFC assessment
9           conflicts with an opinion from a medical source, the adjudicator must
            explain why the opinion was not adopted.").
10
     ECF No. 15, pg. 12.
11

12   Plaintiff also asserts the error was not harmless.  Id. at 12-13.  Finally, Plaintiff contends the ALJ

13   cannot accept Dr. Abrahimi's opinions over those of Dr. Stenbeck because the former is only a

14   reviewing doctor and the latter is an examining source.  See id. at 13-14.

15          At the outset, the Court rejects Plaintiff's assertion that the "treating physician

16   rule" still applies and thus gives greater weight to Dr. Stenbeck's opinion as an examining

17   psychiatrist. Id. While Plaintiff is correct that the Social Security Administration's 2017

18   regulations are still in some dispute, see ECF No. 18, pg. 4, this Court agrees with other Eastern

19   District of California judges in finding that the amended regulations nullify the treating physician

20   rule for claims filed on or after March 27, 2017.  See Buethe v. Comm'r of Soc. Sec., 2021 U.S.

21   Dist. LEXIS 93526; Carr v. Comm'r of Soc. Sec., 2021 U.S. Dist. LEXIS 83505; Jones v. Saul,

22   2021 U.S. Dist. LEXIS 29751.  As Defendant points out, medical opinions under the 2017

23   regulations begin on equal footing, and an ALJ is "not required to discuss the relationship

24   between the doctor and claimant at all, unless two opinions that regard the same issue but are not

25   exactly the same are equally well-supported and consistent with the record." 20 C.F.F. §

26   404.1520c(b)(2)-(3) (2017)." ECF No. 15, pg. 14.  Consistent with Buethe and Carr, this Court

27   will apply this standard.

28   / / /

                                                    9

1      Here, the ALJ supports the RFC assessment with submitted evidence from various

2  medical sources: Michael Kifune, M.D. (Exhibits 3F, 7F); Satish Sharma, M.D. (Exhibit 5F);

3  Lauri Stenbeck, Psy.D. (Exhibit 8F); A. Dipsia, M.D. (Exhibits 1A, 2A); E. Harrison, M.D.

4  (Exhibits 1A, 2A); H. Pham, M.D. (Exhibits 5A, 6A); Heather M. Abrahimi, Psy.D. (Exhibits 5A,

5  6A); records from CO/M/Calaveras Behavioral Health and the Office Treatment Records from

6  Calaveras County (Exhibit 10F, 12F, 15F); and additional evidence of a treatment plan as

7  submitted by Plaintiff's attorney (Exhibit 18F).

8      In determining persuasiveness, the ALJ concluded that Dr. Stenbeck's opinion of

9  Plaintiff's mental health was only somewhat persuasive. This conclusion derives from the ALJ's

10  assessment that Dr. Stenbeck's opinion is largely consistent with the record and supported by an

11  examination of the Plaintiff. CAR 66. Dr. Stenbeck concluded that Plaintiff had impaired

12  attention, concentration, memory, and appeared anxious. CAR 692-693. However, as the ALJ

13  indicated, Dr. Stenbeck's opinion of Plaintiff's anxiety and depression did not match the record

14  that showed Plaintiff's improvement. CAR 66. The record indicates Plaintiff's anxiety and

15  depression showed improvement after recontinuing treatment in 2017 and was supported by

16  Plaintiff's appropriate behavior when engaging with healthcare providers, Plaintiff's small

17  number of outbursts, Plaintiff's ability to maintain his 15-year marriage, and Plaintiff's ability to

18  support his family by overseeing their E-waste recyclable business during the period at issue in

19  the claim. CAR 63-66 (citing Exhibits 7E, 3F/1-3, 5F, 7F/12/38, 8F, 10F, 12F, 15F, 18F).

20      Furthermore, Plaintiff's contention that the ALJ erred in rejecting Dr. Stenbeck's

21  opinion regarding Plaintiff's capacity to attend work or receive feedback is not supported by the

22  record. ECF No. 18, pg. 5. Nor is Plaintiff's contention that the ALJ failed to articulate how she

23  considered the medical opinions and determined their persuasiveness. Id. at 4. The ALJ noted that

24  Dr. Stenbeck found Plaintiff "was moderately limited in maintaining regular attendance in the

25  workplace" and "showed some deficits in mental functioning," which the ALJ determined from

26  the record was "nevertheless compatible with low stress, unskilled work." CAR 66. As discussed

27  prior, the ALJ articulated that Dr. Stenbeck's opinion was somewhat persuasive based on the

28  medical opinion's supportability and consistency with the record as a whole as required of the

2017 regulations. 20 CFR 404.1520c(b)(2). Dr. Stenbeck's opinion and Dr. Abrahimi's opinion were both persuasive, but not equally persuasive. CAR 66-67. Dr. Abrahimi's opinion was based on reviewing the available evidence and concluding specific mental limitations that were supported and consistent with the record as a whole. Id. As a result, the ALJ did not need to articulate the other three factors in 20 CFR 404.1520c(c)(3)-(5) when determining Plaintiff's RFC. The ALJ did not fail to articulate why she found Dr. Abrahimi's opinion more persuasive than Dr. Stenbeck's and was consistent with the administration's 2017 regulations.

Finally, Plaintiff argues that the ALJ does not have the "unfettered discretion to issue orders," nor do the new regulations "give ALJs a reason to ignore material evidence." ECF No. 18, pg. 5. Plaintiff cites Buethe v. Comm'r of Soc. Sec., where the court remanded because the ALJ cherry-picked evidence that supported a conclusion inconsistent with the record as a whole. See Buethe v. Comm'r of Soc. Sec., 2021 U.S. Dist. LEXIS 93526. In Buethe, the court determined that the ALJ misrepresented opinions in her conclusion that the plaintiff could stand/walk for 6 hours out of an 8-hour workday when the medical opinions expressed Plaintiff could only stand/walk for 4 hours with push/pull limitations and recommended sedentary activities. Id. at 16-17. The ALJ constructed an RFC assessment on an earlier version of the plaintiff rather than how the plaintiff was at the time of the case, discounting and seemingly ignoring significant medical evidence rather than resolving conflicts and ambiguities. Id. at 19. The court pointed out that no circuit court has yet to judge what constitutes cherry-picking in "making a supportability or consistency finding, or what kinds of findings explicitly constitute cherry-picking under the new regulations." Id. at 13-14. However, as Plaintiff points out, other district courts have remanded where evidence supporting or consistent with a rejected medical opinion was ignored. ECF No. 18, pg. 4.

In this case, Plaintiff fails to indicate evidence that the ALJ ignored or failed to articulate as persuasive. Plaintiff argues that his ability to regularly and consistently attend work during a 40-hour workweek and that Plaintiff requires gentle feedback from supervisors are highly relevant and ignored portions of Dr. Stenbeck's opinion. Id. at 5. However, the ALJ's discussion of Dr. Stenbeck's opinion notes that Plaintiff is "moderately limited in maintaining

1   regular attendance in the workplace; moderately limited in completing a normal workday or

2   workweek without interruptions; and moderately limited in his ability to deal with the usual

3   stressors encountered in the competitive work environment." CAR 66. The ALJ noted Dr.

4   Stenbeck was somewhat persuasive because her opinion was mostly consistent with the record,

5   but did not set forth any specific limitations for Plaintiff's ability to work a 40-hour workweek

6   when taking into account Plaintiff's RFC. Id. Additionally, the record as a whole indicates

7   Plaintiff's mental health has been improving since continuing treatment in 2017. Id. Plaintiff

8   oversees his family's e-waste recycling business, interacts agreeably with his doctors, and shows

9   capability of performing simple tasks, but is moderately limited by Plaintiff's anxiety and

10   agoraphobia. CAR 65-67. The evidence supports the ALJ's conclusion that Plaintiff is "capable

11   of working in the presence of others, but cannot be part of a work team that requires regularly

12   working directly with others to accomplish a task." CAR 60. The ALJ adequately articulated the

13   persuasiveness of Dr. Stenbeck's opinion and did not reject portions as Plaintiff claims.

14            **B.      Plaintiff's Statements and Testimony**

15            The Commissioner determines the weight to be given to a claimant's own

16   statements and testimony, and the court defers to the Commissioner's discretion if the

17   Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94

18   F.3d 520, 522 (9th Cir. 1996).  An explicit finding must be supported by specific, cogent reasons.

19   See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.

20   See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify

21   what testimony is not afforded weight and what evidence undermines the testimony.  See id.

22   Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's

23   reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also

24   Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue,

25   504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

26   / / /

27   / / /

28   / / /

1        If there is objective medical evidence of an underlying impairment, the

2   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5               The claimant need not produce objective medical evidence of the
[symptom] itself, or the severity thereof.  Nor must the claimant produce
6               objective medical evidence of the causal relationship between the
medically determinable impairment and the symptom.  By requiring that
7               the medical impairment "could reasonably be expected to produce" pain or
another symptom, the Cotton test requires only that the causal relationship
8               be a reasonable inference, not a medically proven phenomenon.

9   80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen,

10  799 F.2d 1403 (9th Cir. 1986)).

11       The Commissioner may, however, consider the nature of the symptoms alleged,

12  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13  947 F.2d at 345-47.  In weighing a claimant's statements and testimony, the Commissioner may

14  also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other

15  inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to

16  follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

17  (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

19  claimant cooperated during physical examinations or provided conflicting statements concerning

20  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

21  claimant testifies as to symptoms greater than would normally be produced by a given

22  impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

23  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24       Regarding reliance on a claimant's daily activities to discount testimony of

25  disabling pain, the Social Security Act does not require that disability claimants be utterly

26  incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

27  repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

28  does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the claimant was entitled to benefits based on constant leg and back pain despite the claimant's ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication").   Daily activities must be such that they show that the claimant is ". . .able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard before relying on daily activities to discount a claimant's pain testimony.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

At Step 4, the ALJ evaluated Plaintiff's statements and testimony.  See CAR 60-65.  The ALJ summarized Plaintiff's statements and testimony as follows:

> The claimant alleged a disability based on physical and mental impairments.  With respect to his physical impairments, the claimant indicated that he experienced bodily pain, especially in his back and lower extremities.  He stated that his back pain has worsened after undergoing surgery, and the wrong type of surgery was performed on him.  He mentioned that he has constant pain and numbness in his legs, and constant back spasms.  He reported that his pain affected his sleep and ability to do personal care tasks.  He indicated that he could not prepare meals for himself, because he could not stand for long periods due to his pain.  He endorsed falling often.  He estimated that he could walk for about 20 feet before needing to stop and rest.  He mentioned that he took medication to treat his pain.  (Exhibit 7E; Hearing Testimony).

> With respect to the claimant's mental impairments, the claimant stated that he suffers from a variety of mental disorders, including post-traumatic stress disorder, anxiety, depression, and bipolar disorder.  He reported that he heard voices in his head and saw a mental health professional for treatment.  He stated that his anxiety interfered with his sleep.  He endorsed often feeling confused.  He mentioned that he did not socialize with others.  (Exhibit 7E; Hearing Testimony).

CAR 60-61.

/ / /

14

1            The ALJ concluded Plaintiff's statements and testimony "are not entirely

2    consistent with the medical evidence and other evidence in the record for the reasons explained in

3    this decision." Id. at 61.  As to Plaintiff's physical limitations, the ALJ's explained:

> In turning to the medical record, the evidence shows that the claimant experienced bodily pains, especially in his back and left lower extremity, but these pains did not cause disabling limitations during the period at issue. The claimant experienced bodily pains even prior to the alleged onset date. However, diagnostic testing reports within the medical record do not support substantial abnormalities, except with regard to the claimant's lumbar spine and left knee. For instance, in January 2016, a left knee x-ray was generally normal, except for a small patellar spur. (Exhibit 3F/52). In February 2016, a left lower extremity MRI revealed a tear in the posterior medial meniscus, and an anterior cruciate strain. (Exhibit 1F/52. A lumbar spine MRI in February 2016 showed disc degeneration at L4-L5, and L5-S1. There was also degenerative arthritis, but no disc herniations. (Exhibit 1F/50). In April 2016, x-rays of the claimant's cervical spine showed no indication of fracture, dislocation, or subluxation. C1-C2 articulation was normal. Overall, there was no acute abnormality. (Exhibit 1F/56). Earlier cervical x-rays performed in January 2016 were also normal. (Exhibit 1F/46). In May 2016, a left foot x-ray showed no acute osseous, joint, or soft tissue abnormality. (Exhibit 1F/57).

> The claimant attributed his back and lower extremity pain largely to the effects of past motor vehicle accidents, with exacerbations of his pain occurring through performing activities like lifting furniture and working on his roof. (See e.g. Exhibits 1F/5/8/14, 3F/33, 5F). He initially received conservative treatment, consisting of things like pain medication, injections, and physical therapy, although this provided only limited relief with respect to his back pain. Better results were achieved with respect to h[is] left knee pain. (See e.g. Exhibits 1F/7/11/14/16/20/34/38, 3F/8/23). Despite the claimant's pain, he initially had a normal gait during his examinations, though there were findings like a painful lumbar range of motion, lumbar muscle spasms, and tenderness. (See e.g. Exhibits 1F/10/18/38, 3F/34).

> In March 2016, he was diagnosed with patellofemoral syndrome with respect to his left knee. Upon examination, he was ambulating well without a limp. He had negative straight leg raise tests bilaterally. His knees had full range of motion. However, he was tender at the medial joint line on the left side. There was mild effusion. Nevertheless, his motor strength was 5/5. (Exhibit 3F/34).

> By November 2016, the claimant was observed to have a limp, though this was more likely related to his back condition. (Exhibit 1F/34). A left knee x-ray in that month was normal. (Exhibit 3F/7). However, the claimant later developed a tibial and fibula fracture in his left lower extremity. During an x-ray performed on January 13, 2017, the tibial fracture was noted to be stabilized with an intramedullary rod, which was in good position and alignment. The fibular fracture was also stable. (Exhibit 3F/6).

15

During an examination on February 21, 2017, a few weeks after the alleged onset date, the claimant was leaning forward while ambulating. He had lumbar spine spasms, and moderate pain with range of motion. (Exhibit 1F/38). The claimant underwent back surgery on June 6, 2017. Right after the surgery, the claimant experienced a complete resolution of radicular symptoms and did not require much in the way of pain medication. He was discharged from the hospital the next day. (See e.g. Exhibit 2F/8/13). However, during a three-month follow-up appointment in September 2017, the claimant complained of low back pain, with bilateral leg pain, left worse than right. He reported that his symptoms were worse than prior to his surgery. (Exhibit 2F/5). He visited the emergency department in October and November 2017, complaining of continued back pain, as well as pain in his elbows, hands and knees, but his examinations did not reveal any significant deficits. The claimant was merely given pain medication. (Exhibit 7F/38-40/44-46).

The claimant underwent a physical consultative examination on November 29, 2017. There, he endorsed musculoskeletal pain consisting of neck pain, back pain, and bilateral knee pain, worse on the left. On examination, he had tenderness to palpation in the cervical spine and paravertebral region. There was pain on forward flexion. However, no cervical muscle spasms were noted. He had tenderness to palpation in the lumbar spine and paravertebral region. While he had pain on forward flexion and extension, straight leg raising was negative. No lumbar muscle spasms were noted. He had a full range of motion in the upper extremities. There was tenderness to palpation of the medial joint line of both knees, as well as pain and crepitation. However, he had 5/5 strength throughout. His sensation was intact. Although he walked with a limp on the left side, and he could not do toe-walking or heel-walking, he did not use any assistive device. (Exhibit 5F).

The claimant received treatment for musculoskeletal pains after the physical consultative examination, but in general, he did not objectively show any substantial deficits in physical functioning during his examinations, despite his complaints of worsening symptoms. His treatment consisted largely of pain medication. For instance, during a hospital visit in January 2018 for a right wrist injury, x-rays of his right wrist were normal. (Exhibit 7F/16). He had a full range of motion in his fingers. (Exhibit 7F/10). During another hospital visit in December 2017 after falling out a car when his feet became entangled, the claimant's back was non-tender, and he had a normal musculoskeletal inspection in general, with equal muscle strength. (Exhibit 7F/18). During a hospital visit in February 2018, the claimant reported that a neurologist found nerve damage during a nerve conduction study. He endorsed experiencing falls due to loss of balance. He mentioned that he could not bend due to his back pain. (Exhibit 13F/13). The only significant objective examination finding was that the claimant "appeared" to have pain with movement of his spine. The doctor requested the name of the neurologist in order to obtain the nerve conduction test results. Nevertheless, the claimant was issued pain medication. (Exhibit 13F/14-15).

The claimant continued this pattern of seeking pain medication for back and leg pain through hospital visits, with his physical examination findings not being very remarkable in general. (See e.g. Exhibit 13F/2-3, 14F/37, 16F/8/3). However, in mid-April 2018, the claimant was noted to

have motor weakness in his lower extremities, though this was not shown in a later examination. (Exhibit 13F/11). At the end of the month, the claimant reported that his back pain was helped with a brace he recently purchased, as he had trouble getting his Norco refilled. (Exhibit 14F/36). He had a limited lumbar range of motion in June 2018, where he requested a referral for pain management treatment for his back pain. (Exhibit 14F/17-18). On the other hand, the claimant went to the emergency department in August 2018 after falling off his motorcycle. The fact that the claimant felt well enough to go motorcycle riding does not support his disabling allegations. (Exhibit 16F/6). On examination, he had a full lumbar and joint range of motion, with only mild tenderness. (Exhibit 16F/8).

Diagnostic imaging after the physical consultative examination continued to show some abnormalities related to the claimant's back, though these abnormalities were not much different from before. A lumbar x-ray in April 2018 showed no acute fracture or spondylolisthesis, but there was moderate L5-S1 degenerative changes with facet arthropathy. (Exhibit 13F/12). A lumbar MRI in May 2018 showed no evidence of acute fracture or cord signal abnormality. There were degenerative changes, worst at L4-L5, causing moderate left-sided neural foraminal stenosis. There was no significant spinal canal stenosis. Post-surgical changes were also observed. (Exhibit 13F/3/8). A cervical CT scan in August 2018 was normal. (Exhibit 16F/8).

The medical record also shows that the claimant was obese, which contributed to his musculoskeletal pain. Obesity is a known contributing factor to various ailments (SSR 02-01p). The claimant was obese during the entire period at issue. For example, during an examination in February 2017, the claimant had a body mass index (BMI) at 37.12. (Exhibit 1F/37). He was also described as obese and/or received BMI levels in the obese range, during other healthcare appointments. (See e.g. Exhibits 5F, 7F/35, 13F/14, 14F/17/37, 16F/3/7). I considered the claimant's obesity as a contributing factor to his various body pains in the assigned residual function capacity.

CAR 61-63.

Regarding Plaintiff's mental health issues, the ALJ stated:

In turning to the medical record relating to the claimant's mental health issues, the evidence shows that the claimant had some mental health problems, but his symptoms did not produce disabling limitations during the period at issue. The claimant's mental health issues existed even prior to the alleged onset date, with past examinations showing things like the claimant having a history of being in an anxiety state. (See e.g. Exhibit 1F/5). In September 2017, after undergoing back surgery a few months prior, the claimant reported to his healthcare provider that he was experiencing more anxiety as a result of not being able to have his medication, clonazepam, refilled with any regularity from a prior provider. (Exhibit 3F/1). On examination, his motor activity and speech were normal. He was noted to have angry outbursts, short-term memory issues, concentration problems, and insomnia, though it is not clear is these were objectively observed conditions, or were based on the claimant's allegations. He was diagnosed with an anxiety disorder. (Exhibit 3F/2-3).

17

1
2

Later, during an emergency department visit in November 2017, the claimant's depression was noted to be reasonably well controlled (Exhibit 7F/38).

3
4
5
6

The claimant underwent a physical consultative examination on November 29, 2017. There, he was calm, cooperative, and verbally responsive. His speech was normal. He was appropriately dressed, with neat and clean clothes. He was also alert and oriented. Memory recall was three out of three words immediately, and two out of three words in five minutes. (Exhibit 5F).

7
8

During an emergency department visit for a right wrist injury in January 2018, the claimant was noted to be anxious, but he was alert, oriented, and able to follow commands. (Exhibit 7F/10). While he endorsed having depression, there was no threat of self-harm. (Exhibit 7F/12).

9
10
11
12
13
14
15
16
17

The claimant underwent a mental health consultative examination on February 22, 2018. He drove himself to the examination. He was considered to be a reliable historian. There, he reported that he had depression, anxiety, post-traumatic stress disorder, and memory loss. He mentioned that he self-isolated, and felt anxious and overwhelmed in public places. He reported hearing voices. Upon examination, his grooming was good. He presented in a friendly manner. He had good eye contact, and he was able to interact appropriately with the examiner. No bizarre behavior was observed. He mentioned that he played a role in overseeing a family business involving the collection of e-waste recyclables. He was cooperative, with no abnormalities in speech. He was alert and oriented. His intelligence was intact. He had an adequate fund of knowledge. While his mood was anxious, his judgment and thought process was intact. However, he was judged to be impaired in his attention, concentration, and memory. He was diagnosed with an anxiety disorder and major depressive disorder. (Exhibit 8F).

18
19
20
21
22
23
24
25
26
27
28

In addition to the above, the claimant also received behavioral health mental treatment, where he learned coping mechanisms to deal with stress and anxiety, and was administered psychotropic medication. He had a series of treatment sessions in the past, in 2014-2015, but stopped for a period, before starting up again in mid-2017. (See e.g. Exhibits 10F, 12F, 15F, 18F). He received diagnoses like major depressive disorder, port-traumatic stress disorder, and agoraphobia with panic disorder. (See e.g. Exhibit 10F/9). His primary issues were a tendency to self-isolate, and anxiety he felt after being involved in car accidents. (See e.g. Exhibit 10F/9/18). He was also involved in an incident when he was a teenager where he was shot in the head. He reported having flashbacks from this event, as well as flashbacks from vehicle accidents [h]e was involved in and/or witnessed in the past. (See e.g. Exhibit 10F/21). Aside from a fluctuating mood, the claimant's mental status examinations were generally normal, though he was noted to have poor memory, and insight at times. (See e.g. Exhibits 10F/27-30/64, 18F/9-12). During past treatment that occurred in 2015, the claimant showed significant improvement in his anxiety, revealing that his treatment, together with his medication, were working well in controlling his symptoms. (See e.g. 10F/44/54). During his treatment sessions beginning in 2017, the claimant also initially reported doing better with treatment. (See e.g. Exhibit 12F/31). However, the claimant did not attend some sessions in early

1    2018, and when he was reached on the phone on February 7, 2018 about
     whether he wished to continue treatment, he became irate, and used
2    profanity. (Exhibit 12F/28). Nevertheless, he still continued treatment.
     While he reported a worsening of his symptoms, including auditory
3    hallucinations, he denied thoughts of self-harm. The claimant found some
     benefit in taking medication, as he continued to request psychotropic
4    medication, and would become upset if his prescriptions were delayed.
     (See e.g. Exhibits 12F/17/19/20/26, 18F/21).

5

6    CAR 63-65.

7            Plaintiff contends that an ALJ's "bare assertion. . . that the objective medical

8    evidence does not support a claimant's testimony does not constitute clear and convincing

9    reason[s] for rejecting a claimant's testimony. (citation omitted).  Instead, the ALJ must identify

10   specific evidence that is inconsistent with specific statements. (citation omitted)."  ECF No. 15,

11   pg. 15.  According to Plaintiff:

12           The only semblance of a potential inconsistency identified by the
     ALJ regarding Nunez's physical condition comes from a note that Nunez
13   fell off a motorcycle at one point. AR 63. The ALJ states that the fact
     Nunez felt well enough to ride does not support his disabling allegations.
14   AR 63. Notably missing from the ALJ's finding is the cause of the
     accident as identified in the medical evidence. AR 979. Nunez was riding
15   his motorcycle at about 30 miles per hour when he ran over something on
     the road. This caused Nunez's back to lock up, then he lost control. AR
16   979. His back locking up while riding, leading to the accident
     demonstrates the difficulty Nunez had riding, not the other way around.
17           Regarding Nunez's mental health, the ALJ attempts to find
     Nunez's ability to interact with providers appropriately as an
18   inconsistency. AR 65. However, Nunez has demonstrated irritable
     behavior and anger towards providers, at one point using profanities
19   towards a provider before hanging up on them. AR 802.
             The ALJ seems to find Nunez's ability to maintain a marriage as
20   an inconsistency. AR 65. The ALJ fails to explain how Nunez's ability to
     stay married is an inconsistency. Nunez's wife helps him dress, drives him
21   around, and shops for him. AR 170, 177, 401. She is the one person
     helping Nunez on his journey.

22

23   ECF No. 15, pgs. 15-16.

24           Defendant argues:

25           . . .[T]he ALJ gave more weight to the medical opinions and prior
     administrative medical findings than Plaintiff's subjective statements,
26   which is consistent with the regulations (AR 65-66). 20 C.F.R. §
     404.1529(c)(4) ("We will consider . . . statements by your treating or
27   nontreating source"). After an examination, Dr. Sharma opined that
     Plaintiff could perform a range of light work (AR 625). Dr. Pham and Dr.
28   Dipsia issued prior administrative medical findings that Plaintiff could

                                   19

perform a range of light work (AR 200-01, 238-39). The ALJ found these opinions mostly persuasive, but assessed additional physical limitations (AR 65-66). Plaintiff did not challenge the ALJ's assessment of these opinions, which is fatal to his challenge to the ALJ's assessment of the subjective statements regarding his physical impairments. As discussed above, Dr. Stenbeck, Dr. Abrahimi, and Dr. Harrison all assessed Plaintiff with no more than moderate mental limitations, which are not disabling. The ALJ appropriately gave these six opinions more weight than Plaintiff's statements. An ALJ may discount a claimant's statements on because they are inconsistent with medical opinions and prior administrative findings. *See Carmickle*, 533 F.3d at 1161 (9th Cir. 2008) (conflict between medical source opinion and claimant's testimony is a valid reason to discount a claimant's statements); *Green v. Berryhill*, 744 F. App'x 336 (9th Cir. 2018) (unpublished) (non-examining opinion supported finding that claimant's statements were not fully reliable).

ECF No. 17, pg. 23.

   Plaintiff's first contention is the ALJ improperly interpreted the event where Plaintiff rode a motorcycle in August of 2018. ECF No. 15, pgs. 15-16. Plaintiff claims the ALJ excludes the fact that Plaintiff's motorcycle accident was caused by his back locking up. Id. at 16. The accident allegedly indicates Plaintiff's difficulty in riding the motorcycle because of his back, not vice versa. Id. Defendant argues that the accident contradicts Plaintiff's oral testimony that Plaintiff limited his driving because of possible danger from his persistent arm or wrist numbness. ECF No. 17, pg. 22. The accident undercuts Plaintiff's "reliability about his statements of disabling physical and mental limitations," and the Court agrees. Id. The evidence from the Mark Twain Medical Center (Exhibit 16F) states:

   Patient with history of low back pain who walked into ED after laying down his motorcycle approximately 3-1/2 hours ago. He was riding about 30 miles an hour with his helmet on when his motorcycle ran over something on the road. It then causes his back tire to lock up and he lost control. Patient then slowly got to the side of the road and laid his bike down. He denies having the motorcycle fell onto his body. He had no LOC. He was able to get up afterwards after landing on the right side of his body. Now he says his neck and lower back are tightening up. Also has some right knee and right wrist pain with some movement. His last tetanus was less than a year ago. He has not taken any pain medicines yet. Current pain level is mild.

CAR 979.

/ / /

/ / /

/ / /

Although Plaintiff and Defendant indicate that Plaintiff's back locked up after
riding over the bump, evidence indicates that it was Plaintiff's back tire that allegedly locked up.
Id. Assuming the evidence intended to show Plaintiff's back locking up, the ALJ reasonably
concluded that the evidence is not consistent with Plaintiff's testimony of pain. Defendant
correctly points out that Dr. Kifune, the attending physician after the accident, noted that Plaintiff
had normal range of motion of all joints, normal range of motion in Plaintiff's back with mild
tenderness, no motor weakness, and equal muscle strength. ECF No. 17, pg. 21. These factors
were noted by the ALJ's analysis and not arbitrarily discredited. CAR 63; see Thomas v.
Barnhart, 278 F.3d 947, 958.

Plaintiff's second contention relates to the ALJ finding regarding Plaintiff's ability
to interact with healthcare providers, a point that the ALJ deems an inconsistency between
Plaintiff's testimony and medical evidence. ECF No. 15, pg. 16. For evidence, Plaintiff points
toward one instance where Plaintiff used "profanities towards a provider before hanging up on
them." Id. However, the ALJ takes into account that Plaintiff has been noted for angry outbursts.
CAR 63. The ALJ states that it is unclear whether these notes were based on "objectively
observed conditions, or were based on the claimant's allegations." Id. Taking into account the few
outbursts Plaintiff had when dealing with medical providers, the ALJ concludes that Plaintiff was
still able to interact pleasantly with doctors, exhibited no bizarre behavior, and that his anxiety
and depression were stable with medication. See CAR 63-65. Defendant argues Plaintiff's "good
results" and reasonably controlled depression with conservative treatment is sufficient to discount
a claimant's testimony regarding the severity of an impairment. See ECF No. 17, pg. 23. The
Court agrees; the ALJ did not improperly discard Plaintiff's testimony about his anxiety and
angry outbursts because evidence indicates Plaintiff has shown improvement with conservative
treatment. CAR 63-65.

Lastly, Plaintiff's argue that the ALJ failed to explain why Plaintiff's ability to
maintain his marriage is an inconsistency. ECF No. 15, pg. 16. Plaintiff's wife often "helps him
dress, drives him around, and shops for him." Id. Defendant claims that the Plaintiff had "greater
social functioning than he alleged, appearing cooperative during treatment and maintaining a long

term relationship (AR 623, 683, 692, 730, 767, 805, 831, 848, 928, 1020, 1030)" and that Plaintiff essentially argues that the Court should emphasize an alternate set of facts. See ECF 17, pgs. 21, 24.

Plaintiff's testimony of pain, symptoms, and level of limitation were taken into consideration when determining the criteria for impairment and RFC. See CAR 60-61. The ALJ found Plaintiff's symptoms could reasonably be caused by Plaintiff's medically determinable impairments, but that the "symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. at 61. The ALJ refers to the record that indicates Plaintiff lives at home with family members, maintains a long-term marriage, and goes outside at least once a day, though there are days he does not. CAR 58. Medical records indicate Plaintiff has interacted well with others, including his physicians and other authority figures, and acted appropriately at the initial disability hearing. Id. at 59. The ALJ notes that these difficulties in self-care are more likely related to physical health issues than mental health, but the Plaintiff does not meet the criteria listed for an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairment in 20 CFR Part 404 in Step 4. Id. at 57, 59. The ALJ has stated clear and specific reasons using available objective evidence to support the ALJ's ultimate RFC conclusion.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## IV.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

        1.     Plaintiff's motion for summary judgment, ECF No. 15, is denied;

        2.     Defendant's motion for summary judgment, ECF No. 17, is granted;

        3.     The Commissioner's final decision is affirmed; and

        4.     The Clerk of the Court is directed to enter judgment and close this file.

Dated:  July 7, 2022

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE